Attorney for the Drawing Implementation and say, let's take figure 4 of the 051, and in figure 4, what is the temporary attachment? What number is it there? I believe it is either 52 or 50. I don't have it marked, but there isn't on figure 4, there's not a 52. I apologize, I was looking at figure 5. I believe the temporary attachment is 40, the second bracket. What makes that temporary or an attachment for that matter? Because its ability with housing 10 to be removed from the first bracket 42, because underlying this invention... I'm sorry, did I interrupt? No, go ahead. So, of course, in preparation for this, I read the patent, and I said, imagine, and I said, okay, what is this? And what this patent is directed towards, this invention is, you have two sensor arrays, you put them in a housing, with that housing, you attach a temporary attachment. The temporary attachment is able to go and be attached at various boards or writing surfaces, and it's also able to be attached, but in this particular case with figure 4, I'm sorry, with figure 4, you're able to put that housing 10 with the two sensor arrays right above the writing surface. It's hard, just as a matter of common parlance, to understand what about this attachment is temporary. What you're saying makes sense with respect to the rest of the limitation. It is a... let me put it this way, if this limitation read, means for removably affixing, then I think you'd be clearly correct in the way you're understanding this claim language and the way it fits with the figures, but temporary attachment seems to me very unhelpful as language to support your position. I understand, and I can understand why you struggle with it, but if I could have you turn to the claims in column 10 in the 051, I can perhaps give you a view that might be helpful. Sure. Because, as you say, if you went with means language, yes, you could have perhaps a more easier resolution, but if I look at column 10 in the first claim, and specifically the claim language, column 10, lines 11 through 12 on A54, a temporary attachment for removably affixing said sensor array. So, a temporary attachment for removably affixing, the writing surface. Now, if you take the word temporary out of there, then things sound a lot different. An attachment for removably affixing said sensor array. The temporary attachment gives you the ability to actually remove it. It is removably affixing. Yes, it's removably affixing. That gives you the ability to remove it. That's true. What this goes to is the superfluous argument that Eppos puts forth is, well, if you put in temporary and you put in removably, then aren't they superfluous? And the answer is no, because if you take out one of those two words, then you don't have a temporary attachment that's removable. So, you say that the attachment is not removable from or detachable from the housing of the sensors, correct? It can be removed. It's a housing with an attachment that can temporarily attach to a presentation board or it doesn't have to. Isn't this also an unusual instance where you're going to cite us to the prosecution history, not to limit or narrow, but to explain your invention? Actually, Your Honor, I would submit that I look at the claim and say, why was it said that way? And the answer is because you want to be able to remove it and you want to be able to temporarily put it in. Because, honestly, can... I'm struggling with this, too. I think, frankly, the language of that phrase is pretty poorly structured, as far as I can tell. But it's what you're saying is, if I look at the whole claim, I see the retrofitable apparatus and then I see comprising two different parts. And one part is a sensor array, and the other part is a temporary attachment you put on the plane or the paper or the board or whatever. And that's what's temporary. It can come off. You don't have to drill holes and make it a permanent attachment. It can be something that pulls off and that. And the district court, at least in your view, erred by looking at temporary attachment as something that temporarily attaches to the sensor, not the other part. Right. What do you do with the prosecution history here? Most importantly, the array can be removed easily from one surface by detaching, so forth. Well, the district court put in can be removed from the device's retrofitable apparatus. It can be or it doesn't have to be. Because the claim language doesn't say one way or the other. There's another situation where the district court imported the limitation into the claims and said, I'm sorry, but your temporary attachment must be able to be removed from the retrofitable apparatus. But the claims don't say that. They say, as you said, Judge Hughes, there's two parts to this retrofitable apparatus. They can be connected. They don't have to be connected. But the sentence that the chief judge read seems to me to be particularly telling in the prosecution history because it starts off by saying, most importantly, the sensor array can be moved easily from one surface to another. That's the whole advantage of the invention, they're saying. And here's how it's done, they say, by detaching the housing from the claims temporary attachment. And yet the burden of your argument seems to be that, well, it's possible to do that, but the way you really make this thing work is to take the attachment, which is permanently affixed, or largely permanently affixed to the housing, and you move it, that whole apparatus, from place to place, correct? Isn't that inconsistent with that sentence that I just read? And I understand you're looking at page 49 of the red brief. Well, I'm looking at page 801 to 802 of the prosecution history in the appendix. And if you read the preceding page and the page after, what's going on there is the patent holder is trying to distinguish a reference called Wilson. And Wilson, if you read this in context, and really what that comes down to is the word from. One word, from, detaching the single housing from the claim temporary attachment. That one word, from, in that one sentence, if you read that entire amendment there, what you will see is that the patent holder is trying to distinguish a prior reference called Wilson. And what they said with Wilson is, Wilson has an array, but they're attached. And so what they did was they amended the claims and said, at least two sentences, fixed in a housing, because they've got to be fixed so they know where the third part is, fixed in a housing, and that's how we distinguish ourselves. What they said about Wilson was, Wilson, if you wanted to do that, you'd have to build a particular frame for each board or writing surface that you're dealing with. So that word, from, I believe is frankly an incorrect word. It should have been with, but please don't make that prosecution history say that word, from, is the entire basis for this claim. Because what it would be doing is taking one word, an entire amendment. And if, please invest, I ask you to invest the time to read the two pages before where you see Wilson's being distinguished, because it's consistent with temporary attachment being part or not part of the housing. Can I just, I asked this once, but I'm not completely sure of how this, you're saying that the temporary attachment is not part of the censor, it's something else. The censor attaches to the temporary attachment. I'm looking at figure four. Yes. And you said, is it 42, and I guess the screw is 44, and that's the temporary attachment. Okay, so on figure four, there are two brackets. I believe 42 is the first bracket, and 40 is the second bracket. And 42 is bolted to the wall. The temporary aspect of it is bracket 40. Because it's able to be removed. So if you had numerous different writing surfaces on the wall, you could take housing 10, along with temporary attachment 40, and move it around the room to the various ones. So you could take your writing implements with you. So 10, I don't, the drawing I have in my memo doesn't show 40, but I think I know where it is, but 10 comes off of 40? Yes, sir. So. No, no, I'm sorry, no, 10 does not come off of 40. Here it is, if it's of any consequence. I can hand it up if you'd like. Can you just point to 40? Yes. So this is 10. That's the housing. There's 40 that has a bracket on it. And those two are connected, and you're able to hang it on a bracket. Okay. If I may move on. Yes, sir. So I take it the word affixed is used in the specification to mean more or less permanently affixed, not temporarily attached. Is that correct? Because the word affixed is used with respect to the description of several of these figures. Like, for example, 40 is said to be affixed to 10. Yes. So they are, you say, locked in. They're not temporary, they're not detachable or anything, and none of the function of this advantage of the patent depends on the removability of 40 and 10 from one another, correct? That's correct. All right. So you say that, I mean, here's what struck me. And if you go back to what I thought you were going to say about the prosecution history, it was that the way this started as temporary attachment method for removably affixing. Yes. So temporary attachment method seems much more consistent with your theory of the case than temporary attachment when you turn the word attachment from an adjective into a noun. Now you've got it, it's a noun. So one wants to say, where's the attachment? This isn't really an attachment, right? It's really more of a means of attaching the removably affixed structure. Aren't you just saying the sensor array is a temporary attachment? I'm sorry, can you say that again? Aren't you just saying that the sensor array coupled with whatever bracketing advice is a temporary attachment? Yes. The sensor array needs to be... This is, I think, where at least I'm struggling is because the claims use them as two different objects rather than saying the sensor attachment can be temporarily attached. And I think that's where the district courts struggle too. Let me try and answer both of your questions. If you have two sensor arrays, they need to be fixed in a housing. So they're fixed so that you can triangulate. Now you have to affix them somewhere around the writing surface. In order to do that you must attach them either to the writing surface or the wall around the writing surface. The objective of this is to do it temporarily so that it can be removed from around the writing surface. And that's exactly what the claim says. Now, I think what you're struggling with is, okay, you've got a retrofitable apparatus with a housing and a temporary attachment. But it's a temporary attachment for removably affixing the device. It's temporary, so it can be removably affixed. But it doesn't require what the claim construction the judge provided, which is an element that can be removed from the retrofitable apparatus. Those things are supposed to work in concert. So the sensor array is separate from the attachment as claimed. Yes, but it's not that it's required to be removable. And in this particular situation, the accused product actually has a clip with the sensor array with it. So it's like a bulldog clip with two sensors on it. Permanently affixed. They are permanently affixed. Now, the Figure 2, I take it that the double-sided tape is 20. Or Velcro. Or Velcro, you're right. Well, all right, either one. That would be a situation in which I guess the temporary attachment would be removable from the sensor array, correct? Because the 20 is attached directly to 10, which is the sensor array. We could get into some interesting semantics about the Velcro, but if you pull the Velcro, half of the Velcro is going to be... But let's assume it's double-sided tape. It's typically double-sided tape. If you can pull it, then it's going to stay on one side or the other. But in any event, there's at least some chance that it stays on the inboard as opposed to the outboard side. That's true. OK, but that, you would... Well, I suppose this is... I understand the point. OK, if I could have you turn to drawing implement. There's a fundamental flaw in error that I want to point out to you. And really it goes to the Markman order. In the Markman order, the district court contradicted itself on drawing implement. It said, and I quote, "...the district court, nothing in the patents suggests that the drawing implement must be limited to a conventional pen or marker." Nothing in the patents say that it's limited to conventional. And yet in that same paragraph, it will construe drawing implements to require a conventional writing utensil. Let me say that again. This is page A1653 of the Markman ruling. The district court says, "...nothing in the patents suggests that the drawing implement must be limited to a conventional pen or marker." Why doesn't the language, and I can't point you to it specifically, but the whole point of the patent saying, we don't want specialized equipment with specialized refills teach away from ethos, which I think does have specialized equipment with specialized refills. And what you're referring to is in the background of the invention, there's six different features and say it's background and field of the invention. They say in this field of the invention, the sixth point I'm going to make is that it used to be, before our invention, you had to use specialized pens. Here, however, they say you can use conventional pens or pens of any shape or size in the spec and that sort of thing. The problem was that in the past, you had to have a very specialized pen in order to use devices like this. Now they say you can use conventional or you could use specialized pens. Your brief hints at this argument at one point, I think, but I wondered why, at least with respect to the, I guess it's the 565 patent, why it is not possible to view the, let me get the claim language. I can't find the 565. Oh, here it is. We have a reference to the handheld drawing implement as having a body and an operative tip. Why isn't it possible to view the, in the case of the EPOS pen, the pen itself as the drawing implement? It has a body. And then we get to the transmitter device, which has a housing. And the pen itself, being the transmitter device, has a housing. The housing happens to be the body of the drawing implement. But there's nothing wrong with the housing and the body being the same thing. In patent parlance, as far as I know. Why, you didn't push that argument, at least. It seems to be floating in places in our brief. As opposed to going to what seems to be this more strained argument that a pen refill is a drawing implement. There's no doubt that the EPOS pen itself is a drawing implement. So I'm curious whether that argument was one that there was a good reason to advance it. Or at least not to press hard. What's that? Or not to press that argument hard. If you look at that entire device, then you have to do a side-by-side comparison of the two drawing implements. And I think you could satisfy an infringement analysis because it has an operative tip, it has a body. The drawing implement, however, has, I believe, a back-end as well as a body and an operative tip. The pen, the EPOS pen, certainly has a back-end. I mean, just on the principle of Occam's Razor, it seems to be an easier way to get to the end. It's good to see Occam's Razor come up. Would you mind if I answer that in my rebuttal time? Sure. Thank you. Mr. Atkins will restore your full rebuttal time. And if you could give Ms. Maynard an extra five minutes if she needs to use it. Thank you, Mr. Chief Judge. May I please report? Deanne Maynard for Defendant EPOS. If I can pick up where you all left off with the drawing implement. Judge Bryson, in answer to your question, they've never accused those two things together. And if they were to do that, the claim, the housing, and the drawing implement are distinct in the claims. And, in fact, I mean, your question gets right to the heart of what Judge Hughes said. They say they're distinct, they're distinct limitations, but that doesn't mean the same structure can't satisfy both limitations. Typically, in the way patents are drafted and interpreted, that comes up with some frequency. I think that when one reads the claims, in this patent and in the other patent, it is clear that they're distinct. Well, the 742, I think you're right. Because there it is distinct. But I'm focusing on the 565. And there, I don't see the distinction. Maybe you've got some particular part of the limitations that I haven't focused on. But if you do, let me know what it is. Well, the way that I read it in context, I think they are separate. Looking at, starting with the preamble, a transmitter device for use with a system for digitizing operative strokes of a handheld drawing implement. The drawing implement having a body and an operative hip. The transmitter device comprising the colon, a housing. The transmitter device has the housing. The drawing implement is separate. And in the third limitation down, a microswitch that is responsive to a force exerted on the operative tip of the drawing implement towards said housing. In other words, the two are distinct pieces. But this gets right to the nub of the problem here. That doesn't help me much. Because that just means that when the tip is pressed towards the housing of the overall device, and that happens regardless of whether you're talking about two devices or one. Well, I think the preamble has set them up. I understand your argument about that. And I think the preamble is limiting here because it's antecedent to the claim. I understand. And it's consistent also with the drawing. So, for example, the drawing that they have in their reply brief, which may have suggested this argument to Your Honor, is figure two, which is on page A57 of this patent. And they reproduce in their reply brief the entire figure and suggest this whole thing could be the drawing implement. But in fact, the patent describes element 42, which is the internal standard with the highlighter pen, marker pen. 42 is the drawing implement and the entire 40 as the transmitter device. No, there's no question that the drawings have the preferred embodiment having separate body and housing. But I just wondered whether the language of the claim was amenable to being read, to reading on a device in which they are the same. But I understand your argument. Let me ask you, if you would, why figure four is consistent with your interpretation of the claim language with respect to the temporary attachment limitation? Yes, Your Honor. To switch the temporary attachment argument, figure four is not covered by the temporary attachment language. So the two patents that have the same... That's a problem for you, isn't it? I mean, you cite two cases, but both of the cases that you cite for the proposition that not all embodiments have to be found in every claim had referred to the possibility of other claims containing limitations that read on those embodiments. Here, we've got no other claims that are candidates. And in fact, it seems to me one of these cases in which the Vitronics language, a claim that does not refer, read on a preferred embodiment, is seldom, if ever, the right construction. That seems to me the problem for you. That would be a problem if that were true. But I have another claim. So the 461 patent... But not in this patent. Well, it's the 051 parent patent application, so they share a similar specification. So it is the law of this Court that it's not preferred to exclude embodiments. However, it isn't the law, and I do think those cases stand for the proposition that not every embodiment must be covered by every claim. If one looks at page A95, which is in the 461 patent, there's exactly the kind of claim that you were pointing out, Judge Bryson, that you think it would be more likely. On column 9, claim 1, the second element, a means for a fixing, the unitary sensor array to the substantially planar surface. And this patent, Your Honor, has the same figures. So this patent has figure 4 on page A87. And I would say that that figure is covered by claim 1, and that that puts us in the cases that we cite. You don't need to read the temporary attachment, which is in its ordinary meaning. Their reading would read out the words... Is that the same argument you would have for figure 3 and 5, too, then? Yes, Your Honor. It seems like only figure 2 has the temporary attachment, as you understand, in the district court found. Is that right? I believe figure 1 also does. It's on A86 in the patent we're looking at now, but a similar figure in the other patent. The fastener is 12. It seems to me the argument you're making with respect to the other patent, which has a shared specification, runs into a problem that, in the description of figure 4 and figure 5 in the specification, the specification refers to those as equally preferred embodiments of the invention, the invention, presumably, of this patent. That is not simply a sort of idle reference to possible embodiments that may or may not be claims. That is talking about a preferred embodiment of this invention, which is hard for me to get over the idea that that better be something that's within the scope of the claim, or then I'm suspicious that I'm not reading the claim correctly. Well, but I think the 461 is the parent application. To the other, to the 051 patent. But still, you've got those preferred embodiments you're reading out, aren't you? No, the preferred embodiments are covered by claims in the parent application. So it's all part of the same line. That doesn't bother you at all? I think when one is looking for an answer to reading out a word from the claim language, temporary attachment, which will render temporary meaningless if you read it the way they ask, versus making sense of these figures by the very same figures are in this parent application and covered by the language, exactly the kind of language that you're expected to see, no, I think that does answer it. I don't think you should limit it by those pictures. What do we do when we have what seems to me just really, really poorly drafted patent language? I mean, if I'm a person off the street reading this and have been helped by my clerks to understand the invention, then I will read this as the whole point of this is just that the censor array can be temporarily put on and taken off. But I understand exactly where the district court and your argument comes from because it seems to identify these as two separate pieces and it talks about a temporary attachment, not as Judge Bryson was saying, a method for temporary attachment. But I just don't understand how a reasonable person would read this poorly drafted language to mean what the district court came up with. But what's our legal framework for deciding that and reviewing that claim construction? Well, I think it is the ordinary meaning of when temporary like that is used as an adjective, that it's the attachment that's temporary, not the thing to which you're going to attach it. So I think the plain language supports it. I think the specification supports it because there are figures that suggest attachments that are temporary, including the double 60 case, including the brackets in Figure 1. And then the prosecution history, also the fact that they took the word method out. Yes, Ron? Well, I want to go from deep down in the weeds up about 10,000 feet and ask you, isn't there a pattern here where you put conventional in when the specification says that's not required at all? The specified time period, you read in a limit on that when it's specifically not in there. We see in each one of these a pattern, perhaps, of reading in limitations that you don't find in the claim and that the specification allows a broader reading for. How do you deal with what seems to be a pattern of missing it? Well, let me start with drawing implement. You're going to go back in the weeds and try and tell me each one of them have a justification? Well, I think the court does have to take each term on its own. I agree with you. And if you can do that, it'll be fine. But you're really swimming upstream on the drawing implement, aren't you? I've got in my bench brief here four or five places where it says it may be used with a conventional pen element. It talks about drawing implements with a range of lengths and widths giving hardly the impression that we're tied to a particular conventional marking element. I'll give you two 10,000 foot points on it. The first one is they disclaim in the background the very thing they're now trying to accuse of infringement. They say, we're better because we're inventing a digitizer system that can use a conventional whiteboard with a conventional pen and they disparage products like our products that are specialty pens. And now they're trying to twist their patents to come after our product. That's my number one 10,000 foot point. May I make my second one, Judge Bracey? My second 10,000 foot point is even under the ordinary meaning of drawing implement, a pen refill is not a drawing implement. It's a component of a drawing implement. And even if this court says, we're going to just read drawing implement as drawing implement, like you just showed me, the pen you just showed me, what they're accusing as a drawing implement is not a drawing implement. It's a component of a drawing implement. And so you can affirm on that basis it's an alternative ground even if you don't agree with the construction. The thing that troubles me about the first argument, I understand the second, but the first is that the patent is saying the advantage of the patent is that it doesn't have to be used with a specialty instrument. But that's quite different from saying that it is required that there not be a specialty instrument. In your case, if you were right that simply the thing that this can be used with a conventional writing instrument without the need for a specialty instrument, if that's enough to exclude or disclaim specialty instruments, it would be pretty easy to infringe this patent simply by the manufacturer saying, oh, by the way, our pens are specialty instruments, they have our name on them, and you all out there do not use this device with any pen that doesn't have our name on it. Well, but the whole product here that they're accusing is a specialty instrument. This goes back a little bit to your first question, Judge Bryson, about why are they accusing the pen refill. I mean, they're just accusing the pen refill inside our specialty instrument, which would be... This is about notice. If a competitor reads this patent and has a specialty pen like our specialty pen, you would read that column and say, this isn't about me. And that would be justified by the abstract. The abstract we mentioned which says this invention is directed to a conventional whiteboard used with a conventional pen. Well, I understand the point, but to get back to what's bothering me about your first point, is if I have a patent on, let's say, a hybrid automobile engine, and I say a great advantage of this hybrid automobile engine is it doesn't need a fuel injector, and then you come along and you produce a hybrid engine in which you use a fuel injector, you still infringe. I've said it doesn't need a fuel injector, but I haven't said you can't use one within the scope of my claim. But why isn't that like the specialty pen so-called disclaimer in this case? I haven't disclaimed a fuel injector. Because what they disclaimed here is a hybrid engine. They disclaimed the entire product that is our product and said we've got a great new thing. You can take, if you have a whiteboard and you have conventional markers, you can turn your whiteboard system into a digitizer. This is different from the prior art where there's specialized pens that require specialized refills. They disclaimed coverage of our entire product. And that's the difference. What about the given time interval? The given time interval, Your Honor, without some basis in the specification, completely unbounded. We all know what the function is. You just want to make sure it doesn't miss when you're taking short pen strokes. They suggest that two seconds would be enough to avoid that problem. You go 25. Still, you're both solving the problem, just keeping the pen going. There's nothing in the patent, nor have they claimed, that you would need to solve that problem by keeping it any length of time beyond several seconds. In fact, the patent talks about that it isn't a problem. They didn't claim it as two seconds. They claimed it as a given time interval. And as long as it's a given time interval, what's our problem? Ten hours, given time interval? Yes, probably. But nothing in the patent would support that. And this Court doesn't read patent claims in ways that would make them invalid. There's no written description for ten hours. The only problem, the only mention of it in this patent, is this problem of the dashes. And in that mention, it expressly says it's only a problem for short strokes. Because the delay is really short. The delay is like a fraction of a second. And so, for anything longer than that, it picks back up before it's needed. So it's only with the short strokes. There's nothing to support keeping it going for 25 seconds. So even if they think less than a few seconds is not enough, it certainly wouldn't get them out to 25 seconds. It certainly wouldn't get them out to ten hours. And without any kind of bounds, upper and lower bounds, a competitor has no idea what this patent covers. Oh, well, wait, wait, wait. A competitor, if the competitor understands a specific time, and they have a specific time of any dimension at all, they know the patent covers that. There's no ambiguity about what specific time means. Right? Well, with respect, it's a given time. And a given time... Specified time, let's say. That's the construction they want. I think given is something that's in reference to something. In reference to what? No, in reference to what the designer has programmed in. That seems to me what given means. That argument I'm not going to buy. So try again. Well, even if one says, then in order to say given what? Like a patent that says a given distance. I mean, we can look at the specification and become informed by what might be within a given time. Even if, Your Honor, if I go with you to specified time, specified to any specified time, they could get five hours of specified time out of this patent? Well, there's no confusion to the potential infringer as to what the limitation requires. Well, then I'll fall back on written description. All right. There's absolutely no written description suggesting any time more than just a few seconds. And so the district court's construction was correct. And there's an alternative basis to affirm as well. They don't respond to it on what is, I think, an incorrect basis. The court can affirm, of course, on any ground appearing in the record. And our circuits don't perform the way, even under their preferred construction. So if you have more questions, I'm happy to address their many terms of that issue if you have concerns about any others. Thank you, Ms. Maynard. We request that you affirm. I think we got that one. Mr. Adkins. We restored your rebuttal time. Five minutes. Thank you, Your Honor. Thank you for restoring the time. In answer to the question that you asked, and you gave me a chance to sit down and think about Occam's razor, indeed, you could call the entire device a drawing instrument. Figure 5 of the 565... Did you make that argument? I sensed hints of that argument in your brief, but it actually never congealed into a real... We didn't make that argument as forcefully as we could or should have. Luckily, you have the ability with de novo claim construction to... Well, there's a difference between de novo claim construction and coming up with a larger waiver of possible constructions. But isn't this just a question of law? I don't think I'm really putting that question to anybody in particular. Please continue, Mr. Adkins. We've heard about drawing implements and pen refills and that sort of thing. One of the most interesting facets of this case was our request for a motion for reconsideration as to whether a pen refill really was a drawing implement. And we put in a body of evidence which you saw pictured in our reply briefs. I'm sorry, but unfortunately we use a lot of pictures. And we have them here with us if you care to actually see them, we can give them to the bench. But the key thing there is even if the claim construction below is right, and I don't believe that it is, because conventional is wrong as well as other aspects of it, but these pen refills are actually conventional and actually used pretty commonly. The second point I have is there was not a disclaimer. It was one of six facets in the background of the invention. And just because it said specially produced pens were... I just want to... That last point, I'm not sure what I exactly understand you're saying, but are you saying that pen refills can be considered a drawing implement just because you can draw with them or make marks with them? Yes, but even more importantly than that, I mean, for example, because, I mean, that's true. I can take apart this pen and I'll spill ink all over myself. These are government pens. I can draw with it, but nobody thinks of the inner part of this as a drawing implement. It may be theoretically in some philosophy class a drawing implement, but the pen is a drawing implement. What's conventional to you might be... What is not conventional to you might be conventional to somebody else. For example, I spoke to my wife about this argument. She says, well, of course, I write with anything. When one of the kids calls, I've got to write stuff down. I've written with crayons and other things, which might not be conventional. Not only that, but conventional changes over time. That's part of the problem with this word conventional injected into the claim. And it's a conventional writing utensil. Part of the problem was in the summary judgment analysis was it's a conventional writing utensil that could be conventionally used because it's implicit in that oh, it's got to be conventionally used. Is it a conventional writing utensil? Those are standard D1 pen refills that are sold on Amazon in bulk, believe it or not. Okay? Time interval? Do you need to go 25 seconds? What about our 10 hours? Yes, that's a great question. On time interval, the patent holder put in specifically a given time interval. And the reason it's a given time interval and you could say specified time interval is because the designer, when they design these pens, they have small button batteries in them. And you could put in 10 hours, but that means if you lifted the pen, the pen would sit there and transmit for 10 hours and burn out the battery. So it's really a designer's choice. The specification says here's the problem. When you lift up the pen and it stops instantly and you put it back down, there's a delay. So if somebody picks up and starts writing, for example, Judge, J, lift up, U, the top of that U won't appear as the transmission starts up again. So what these folks did is say, well, let's put in a specified, a given time to let it continue in transmitting. A normal designer wouldn't let it go for 25 hours. But 25 minutes? Yes. 25 seconds? Yes. It's up to the designer. All it says is a given time interval. We didn't discuss the equivalence issue before, but could you say a few words about that, because it struck me that that's a problem for you, the equivalence on the pulsing versus continuing. And your question goes to if the claim construction given time interval is fixed at a few seconds or less, how is that possibly equivalent to 25 minutes? No, I'm going to a different patent altogether. I'm going to the equivalence with respect to the pulsed signal versus the continuous signal. Yes, the challenge there was two experts were disputing as to what the applications actually were with regard to continuous signal. That goes to, if I'm the transmitter and you two gentlemen are the receivers, it's called time of flight. So the patent teaches a synchronous signal that goes out and has a gap. So it sends out a signal, stops, gap, and that signal will be received by each of you gentlemen at different times depending on where I am, because it's transmitted at the same time. In the accused device, they sent out a series of 1 through 10, 1 through 10, 1 through 10. It's a wave as well. And the two experts disputed as to what actually was a continuous signal or an intermittent signal. Our experts said that the accused device is actually an intermittent signal and I believe their experts said it was not. But I know for certain that ours did and we came on that. But you asked for doctrinal equivalence. I want you to focus on the doctrinal equivalence issue. Yes. I mean, the problem obviously is that we have a line of cases that say cases in which you have exact opposites. They are not equivalent. Sage products, Moore, a variety of other cases that say yes, grey may be equivalent to white, but black is not equivalent to white. Yes, partially open may be equivalent to largely open, but open is not equivalent to closed. Why isn't this another in that line of cases? And that goes down to what our experts said, Dr. Sidman. He said this is equivalent because this situation and this particular wave that they choose to transmit ultrasonically actually has intermittent aspects to it. But that gets back to the literal infringement argument. I mean, if we accept that one of them is intermittent and the other is continuous, is there an argument to be made that those two are equivalent? Yes. Setting aside the literal infringement argument. And by the way, to the extent that experts make statements along that line, we would have no summary judgments if we were required to say, well, the experts said it was so, and therefore it's a triable issue. So we can't simply take an expert's assertion that something is equivalent as being sufficient to overcome a summary judgment. So why is there equivalence here? I understand. And that's perfectly understandable when it's black and white. Here it's more of a black and gray situation because the patent claims an intermittent signal. The underlying specification teaches a signal that's given out, pause, signal that's given out, we have a gap. Their argument is, we've got no gap. Now, that goes down to what does intermittent really mean? And what they've done is they send out a signal that's got, and I'm really oversimplifying here because this is unfortunately the way I understand it, they've got a signal that has 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, without a gap. Our view is that that is two signals mashed together, but they're still intermittent because here's 1 through 10, here's 1 through 10, here's 1 through 10. Just because there's no gap doesn't mean that it's not intermittent. OK. Thank you very much. Thank you very much.